**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **JOSHUA KASPRZYK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE SCOULAR COMPANY,**<br><br>**Defendant.** | **Case No. 2:24-cv-02597-JMK-RES** |

**MEMORANDUM AND ORDER**

This an employment case in which Plaintiff Joshua Kasprzyk alleges that his former employer, Defendant the Scoular Company ("Scoular"), discriminated against him because of his age and disability, unlawfully withheld a bonus to which he was entitled, and retaliated against him for seeking accommodation and expressing workplace safety concerns. Doc. 37. Scoular moves for summary judgment against Kasprzyk on all claims. Doc. 38. Because Kasprzyk has failed to create a genuine issue of fact as to any of his claims, the Court grants Scoular's motion.

## I. BACKGROUND[1]

Kasprzyk began working at Scoular in 2007. Doc. 39 at ¶ 1. Kasprzyk asserts that he suffers from "Stress, Anxiety, and Depression," but he has never been diagnosed by a medical provider with any mental health condition and has never sought treatment from a mental health professional. Doc. 46 at ¶ 4; Doc. 39 at ¶¶ 26–27. Kasprzyk purports to controvert Scoular's assertion that he has never been diagnosed by a medical provider with any mental health condition, but his cited testimony does not controvert Scoular's cited testimony in any way.

[1] The facts are uncontroverted unless otherwise indicated.

In approximately May 2023, Kasprzyk was offered a Regional Manager position overseeing two facilities in north Florida – Lake City and Live Oak. Doc. 39 at ¶ 2. Kasprzyk's annual base salary as Regional Manager was $175,000. *Id.* at ¶ 7. Kasprzyk was also offered an incentive bonus of $225,000 for fiscal year 2024 to take on the role of Regional Manager. *Id.* at ¶ 8. Scoular's fiscal year is June 1 through May 31. *Id.* at ¶ 9. Kasprzyk's receipt of the bonus was contingent upon his continued employment through the expected payout date of the bonus, as was expressly stated in his offer letter. *Id.* at ¶¶ 10–11. Kasprzyk claims that this condition of his continued employment is controverted, but nothing in his testimony contradicts the plain language of his offer letter, which provides that "[p]ayment will be conditioned upon your continued employment through the incentive payout date (typically August following fiscal year end)." *Id.* at Ex. A. In fact, during his deposition, Kasprzyk acknowledged that the offer letter said that payment of the bonus was conditioned upon his continued employment. Doc. 46 at Ex. B, 123:17-19.

Continued employment through the payout date is a general requirement for all bonuses paid by Scoular to its employees. Doc. 39 at ¶ 13. No one at Scoular represented to Kasprzyk that the requirement of continued employment through the payout date would not be imposed. *Id.* at ¶ 14. Kasprzyk also purports to controvert paragraph 14 of Scoular's Statement of Facts, but his cited testimony does not controvert this fact. Kasprzyk testified that he was aware of some employees who were paid out their bonuses after separation in exchange for signing severance agreements, but he does not testify that anyone at Scoular represented to him that the requirement of continued employment through the payout date would not be enforced. The bonus would be paid to Kasprzyk partially in cash and partially in restricted shares of Scoular common stock in accordance with Scoular policy. *Id.* at ¶ 15.

During Kasprzyk's tenure as Regional Manager, the Live Oak facility faced an issue with dust and the feed bins at the Lake City facility "seemingly" needed replacement or repair. Doc. 39 at ¶¶ 37–38. Kasprzyk raised concerns about safety with members of Scoular management and discussed the dust issue with two HR representatives, but did not make a report to a government agency, or through a Scoular hotline. *Id.* at ¶¶ 46–50.[2] Kasprzyk cannot identify a particular law that Scoular was violating because of the conditions at the Florida facilities. *Id.* at ¶ 52.

In June 2023, Chad Gauger became Kasprzyk's direct supervisor. *Id.* at ¶ 16. On unspecified dates, Kasprzyk reported to a Scoular Human Resources business partner, Shauna Nylund, that he felt "stressed" working for Gauger. *Id.* at ¶¶ 18, 23. He told the same to Joe Andrus, Scoular's Senior Vice President, Feed & Food Division Manager. *Id.* at ¶¶ 4, 24. On an unspecified date, Gauger told Kasprzyk that he was "getting paid too much" and "[s]omebody less experienced could do the job cheaper." *Id.* at ¶ 21. On another unspecified date, Gauger made a comment about Kasprzyk "being stressed out or too stressed out." *Id.* at ¶ 25.

In the end of summer or early fall of 2023, Kasprzyk talked to Gauger about Kasprzyk's "stress level being really high, [Kasprzyk] traveling down to Florida more than he planned to, being away from his family," and stress with a teammate. *Id.* at ¶ 30. He also told Nylund that he was "working seven days a week," that "his family was unhappy," that it was "affecting his marriage," that things were "getting to the point" where they were "affecting his mental capacity," and that working with Gauger increased his stress and anxiety so that he wasn't sleeping. *Id.* at ¶ 31. On or about June 1, 2024, Gauger completed Kasprzyk's performance review and gave

[2] Kasprzyk also asserts that Donald Maulden, supervisor of operations at the Live Oak facility, recalled that Kasprzyk voiced concerns that the facility was making more feed than it could safely handle and that another Scoular team member, Matthew Erickson, was made aware of safety issues at both facilities through Kasprzyk's voiced concerns, but these statements are not supported by the record. Doc. 46 at ¶¶ 14, 17; Doc. 46 at 18; Doc. 39 at ¶ 42.

Kasprzyk an overall rating of "2." *Id.* at ¶ 56. A "2" rating corresponds with "meets some expectations." *Id.*

On June 18, 2024, Kasprzyk sent an email to Nylund detailing his complaints about Gauger. *Id.* at ¶ 57. Kasprzyk's email did not assert that Gauger was treating him differently or targeting him because of his age, nor did he mention a disability, discrimination because of a disability, retaliation for engaging in protected activity, or request for accommodation. *Id.* at ¶¶ 60–61. Nor did the email raise any safety concerns or assert that Scoular was violating any laws. *Id.* at ¶ 59. Kasprzyk tries to controvert this fact, but no evidence contradicts the plain language of the email.

After sending his email to Nylund, Kasprzyk had additional discussions with Nylund and Andrus, stating that he could no longer report to Gauger and that he would like to avoid any one-on-one contact with Gauger. *Id.* at ¶¶ 62–63. He also informed Nylund and Andrus that he either wanted to continue in his role as Regional Manager with a different supervisor, find a different role within Scoular in an equivalent or more senior position, or exit the company. *Id.* at ¶¶ 64–65.

Nylund reached out to the Human Resources Director from the grain division to determine whether there were any positions that would be a fit for Kasprzyk. *Id.* at ¶ 66. Andrus also inquired about other positions for Kasprzyk in the grain division, but was informed that there were no positions available for him. *Id.* at ¶ 67. Kasprzyk consistently followed up with Nylund and Andrus asking for a "timeline on a change," meaning his position or request for a new boss. *Id.* at ¶ 68. Gauger was not involved in discussions regarding how to address Kasprzyk's demands or whether to end Kasprzyk's employment. *Id.* at ¶ 69. After exploring the options presented by Kasprzyk, Andrus, with involvement from Nylund, made the decision to end Kasprzyk's employment, as it was the only remaining option of Kasprzyk's demands. *Id.* at ¶ 70.

On or about July 10, 2024, Andrus and Nylund met with Kasprzyk to inform him of the termination of his employment. *Id.* at ¶ 73. Nylund informed Kasprzyk that he was not eligible to receive the $225,000 incentive bonus because he would not be employed on the payout date. *Id.* at ¶ 76. Kasprzyk was 41 years old at the time of his separation from Scoular. *Id.* at ¶ 75.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* To determine whether a genuine dispute exists, the court views the evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *Id.* Once the moving party meets its burden, the burden shifts to the nonmoving party to "set forth specific facts" from which a reasonable jury could find for the nonmovant. *Id.* at 671.

## III. ANALYSIS

### A. Kasprzyk has failed to raise an inference of ADEA discrimination.

Kasprzyk first claims that Scoular violated the Age Discrimination in Employment Act ("ADEA") by terminating his employment because of his age. The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). This prohibition applies to protect "individuals who are at least 40 years of age." 29 U.S.C. § 631(a). To prove an age discrimination claim, a plaintiff must show "that the challenged employment action was motivated, at least in part, by age" or that "age was a 'but-for cause, of the employer's adverse decision.'" *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080–81 (10th Cir. 2023) (quoting *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1114 (10th Cir. 2007);

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020)). The plaintiff may carry this burden by "presenting direct evidence of the employer's discriminatory intent or by presenting circumstantial evidence creating an inference of a discriminatory motive" using the *McDonnell Douglas* framework. *Id.* (quoting *Riggs,* 497 F.3d at 1114).

Kasprzyk has not presented direct evidence of Scoular's discriminatory intent, so Kasprzyk must show that he (1) is within the class protected by the ADEA, (2) suffered an adverse employment action, (3) was performing satisfactory work, and (4) was treated less favorably than younger employees. *Markley*, 59 F.4th at 1081; *Roberts v. Winder*, 16 F.4th 1367, 1384 (10th Cir. 2021); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). "[T]he fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios." *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005). This can include, among other things, "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" or "preferential treatment given to employees outside the protected class." *Id.*

Scoular does not dispute that Kasprzyk was a member of the class protected by the ADEA, was terminated, and was qualified for his former position. Rather, Scoular asserts that Kasprzyk cannot identify any substantially younger employees who were treated more favorably than Kasprzyk for the same or similar conduct. In response, Kasprzyk asserts that Gauger changed his "job responsibilities and/or demands," "verbally abuse[d]" him, gave him a "poor performance review," and subjected him "to a disparate level of adverse treatment." *Id.* at ¶ 3. Kasprzyk also names three employees who he alleges were younger than him, were supervised by Gauger, witnessed Gauger subjecting him "to a course of adverse treatment . . . in team settings," and who

were "not subjected to th[e] same type of mistreatment." Doc. 46 at ¶¶ 9–11.[3] Kasprzyk also asserts that one of the three employees was "afforded a transfer into an alternative position" while Kasprzyk was not. *Id.* at ¶ 11.

Although Kasprzyk does not describe the changes to his job responsibilities, Gauger's "verbal abuse," or the "disparate level of adverse treatment," the record evidences the following: (1) Gauger told that Kasprzyk he was "getting paid too much" and that "[s]omebody less experienced could do the job cheaper;" (2) Gauger made a comment about Kasprzyk "being stressed out or too stressed out;" (3) Gauger gave Kasprzyk an overall rating of "2" on his performance evaluation; and (4) Andrus and Nylund terminated Kasprzyk's employment. Doc. 39 at ¶¶ 21, 25, 56, 70, 73.

First, even if Gauger's comments about Kasprzyk's pay could be interpreted as a comment about Kasprzyk's age, Kasprzyk does not connect these statements to his eventual termination. Without some nexus to Kasprzyk's termination, Gauger's comments are too isolated and ambiguous to support a finding of discrimination. *Mauldin v. Driscoll*, 136 F.4th 984, 997 (10th Cir. 2025); *Ward v. Jewell*, 772 F.3d 1199, 1203–04 (10th Cir. 2014).

Second, Kasprzyk does not describe the allegedly "adverse treatment" that the three, younger employees witnessed but were not subjected to, nor does he present evidence that any similarly situated, younger employees with similar performance records were given better performance ratings. He also fails to provide any detail about the third employee's transfer into an "alternative position," such as why the employee was transferred, when the employee was transferred, whether the employee received more or less pay after the transfer, or whether the

[3] In contrast to this statement, Kasprzyk also identified one of the three, younger employees as a victim of Gauger's "inappropriate behavior" in his deposition. Doc. 49 at ¶ 9.

employee was transferred into a role with similar duties and responsibilities. Kasprzyk's conclusory statements fail to raise an inference that the younger employees were treated more favorably than Kasprzyk. *See Bird v. W. Valley City*, 832 F.3d 1188, 1206–07 (10th Cir. 2016).

Finally, Kasprzyk does not provide evidence that the younger employees were similarly situated to him other than that they were also supervised by Gauger. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Riggs*, 497 F.3d at 1120 (quoting *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007)). "[W]hether two employees are similarly situated ordinarily presents a question of fact for the jury," but "a court evaluating a motion for summary judgment must determine whether a plaintiff has adduced enough evidence to support a finding that the other employee and plaintiff were sufficiently similarly situated to support an inference of discrimination." *Sousa v. Chipotle Servs., LLC*, 167 F.4th 1286, 1300 (10th Cir. 2026) (quotation marks and internal alterations omitted).

By failing to produce evidence regarding the other employees' roles at Scoular, their relevant conduct at Scoular, or the standards governing their performance evaluation and discipline, Kasprzyk has failed to show that the younger employees were similarly situated to him. *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). Because there is no evidence from which a reasonable jury could infer that Scoular terminated Kasprzyk because of his age, the Court grants summary judgment for Scoular on Kasprzyk's ADEA claim.

**B. The Court grants summary judgment against Kasprzyk on his ADA claims.**

Kasprzyk next brings discrimination and retaliation claims under the Americans with Disabilities Act ("ADA"). The ADA prohibits discrimination in employment against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). This includes "application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and

other terms, conditions, and privileges of employment." *Id.* An employer also cannot discriminate against an individual because he or she "has opposed any act or practice made unlawful by [the ADA]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1186 (10th Cir. 2016) (quoting 42 U.S.C. § 12203(a)).

First, Kasprzyk alleges that Scoular violated the ADA by terminating his employment because of his "anxiety, depression, and stress." Doc. 37 at 12. Second, Kasprzyk alleges that Scoular violated the ADA by terminating his employment in retaliation for "seeking recognition of his ADA rights" and accommodation. *Id.*

**1. Kasprzyk has not presented sufficient evidence that he is disabled.**

To succeed on a claim of ADA discrimination, Kasprzyk must demonstrate (1) he "is disabled as defined by the ADA;" (2) he "is qualified to perform the essential functions of the job with or without reasonable accommodation;" and (3) he "suffered discrimination on the basis of [his] disability." *Unrein v. PHC-Fort Morgan, Inc.*, 993 F.3d 873, 877 (10th Cir. 2021) (quoting *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1261 (10th Cir. 2009)).

Under the ADA, as amended by the ADA Amendments Act, "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(1). Kasprzyk identifies his disabilities as "Stress, Anxiety, and Depression." Doc. 46 at ¶ 4. Kasprzyk does not contend that he has a record of these impairments or that Scoular regarded him as impaired. Rather, he simply asserts that he has "stress, anxiety, and depression," and concludes that these are recognized disabilities under the ADA. And so, his sole claim is actual impairment under paragraph (A). *See Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014).

To proceed based on actual impairment, an ADA plaintiff must (1) show he has "a recognized impairment;" (2) "identify one or more appropriate major life activities;" and (3) "show the impairment substantially limits one or more of those activities." *Id.* "An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 996 (10th Cir. 2019) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)) (alteration in original).

Kasprzyk asserts his "Stress, Anxiety, and Depression" interfered with the major life activity of "working." Doc. 46 at 13. Specifically, Kasprzyk states that these alleged disabilities "directly impacted his ability to travel, spend time away from family, as well as work with his direct supervisor." *Id.* But, Kasprzyk's evidence cited in support of his statement includes only (1) his identification of his alleged disabilities; (2) his notification to Gauger that he did not like traveling for work; and (3) his notification to Nylund that he was stressed because of his role and his relationship with Gauger. *Id.*

These conclusory statements do not establish that Kasprzyk has a recognized impairment or that these impairments substantially limit at least one major life activity. *Freeman v. City of Cheyenne*, 660 F. Supp. 3d 1155, 1162–63 (D. Wyo. 2023). Although the ADA regulations provide that "the comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis," courts must analyze the necessity of medical evidence on a case-by-case basis. *Tesone*, 942 F.3d at 996 (quoting 29 C.F.R. § 1630.2(j)(1)(v)) (internal alterations omitted).

While certain physical impairments "might fall 'within the universe of impairments that a lay jury can fathom without expert guidance,'" diagnosis of a mental health condition and statements regarding how that condition limits major life activities "are clearly matters beyond the realm of common experience and require the special skill and knowledge of an expert witness." *Compare id.* at 999 (concluding that "a back injury could be 'among those ailments that are the least technical in nature and are the most amenable to comprehension by a lay jury'"), *with Clancy v. Miller*, 837 F. App'x 630, 635–36 (10th Cir. 2020) (affirming a district court's conclusion that a plaintiff could not prove that her depression, anxiety, and PTSD substantially limited at least one major life activity without expert testimony), *cert. denied*, 141 S. Ct. 2504 (2021), *and Neri v. Bd. of Educ.*, 860 F. App'x 556, 562–63 (10th Cir. 2021) (affirming summary judgment where the plaintiff "did not present medical evidence to link her PTSD diagnosis with her symptoms to establish that her PTSD substantially limits at least one major life activity").

Because Kasprzyk has never been diagnosed by a medical provider with a mental health condition and has not presented any evidence of how his alleged disabilities substantially limited his ability to work, he has failed to establish that he is disabled within the meaning of the ADA. To the extent Kasprzyk intended to assert that he was "regarded as" disabled, he also presents no evidence that anyone at Scoular regarded him as disabled. Rather, Kasprzyk told Gauger that he did not like traveling for work and told Andrus and Nylund that he was stressed because of his role and his relationship with Gauger. Doc. 46 at 13; Doc. 46 at ¶ 25.[4] Kasprzyk has failed to establish his prima facie case of disability discrimination and summary judgment against him is proper.

---

[4] Although Kasprzyk states that Andrus was aware of his "disabling conditions inclusive of stress and anxiety," the cited testimony provides only that Kasprzyk told Andrus that he felt "highly stressed" working under Gauger.

**2. Kasprzyk has not presented evidence of protected activity.**

To establish a prima facie case of ADA retaliation, Kasprzyk must prove that "(1) he engaged in a protected activity; (2) he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action." *Foster*, 830 F.3d at 1186–87 (internal quotations and alteration omitted). Kasprzyk asserts via declaration that "[a]s soon as [he] made formal complaints about his wrongful treatment and requested reasonable accommodation . . . of a new direct supervisor, and a job transfer within the company, his Scoular supervision commenced a pattern of behavior that ultimately resulted in his termination from employment." Doc. 46 at ¶ 5. But that statement is wholly conclusory and not supported by the evidentiary record.

Protected activity under the ADA includes requesting reasonable accommodation or opposing conduct made unlawful by the ADA. *Foster*, 830 F.3d at 1187–88. A request for accommodation must be "sufficiently direct and specific, giving notice that the employee needs a special accommodation." *Id.* at 1188. Likewise, protected opposition requires that the employee "convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the statute." *Anderson v. Textron Aviation, Inc.*, 2022 WL 15427625, at *4 (D. Kan. Oct. 27, 2022).

Kasprzyk does not explain when he made formal complaints or requested accommodation, nor does he describe the content of the alleged complaints or accommodation request. Assuming that Kasprzyk intended to assert that his June 18, 2024, email constituted protected activity, his claim fails. Kasprzyk's June 18 email contained a number of complaints about Gauger, but none suggested that Kasprzyk believed Gauger was discriminating against him because of his alleged disabilities. Doc. 39 at ¶¶ 57, 61. Likewise, Kasprzyk sent Teams messages to Nylund on June 24, 2024, expressing frustration that Gauger micromanaged Kasprzyk and requesting "another role,"

"not reporting to [Gauger]," or "an exit from the company." *Id.* at ¶ 64. But, again, Kasprzyk made no mention of his alleged disabilities or suspicions of discrimination. *Id.*

Although Kasprzyk did not need to "formally invoke the magic words 'reasonable accommodation,'" the Court cannot infer that Kasprzyk engaged in ADA protected activity without testimony or evidence detailing Kasprzyk's discrimination complaint or request for accommodation. *Foster*, 830 F.3d at 1188. If evidence of ADA protected activity exists in the record, Kasprzyk has not presented it to the Court. The Court grants summary judgment in favor of Scoular on Kasprzyk's claim for ADA retaliation.

**C. Kasprzyk has not produced sufficient evidence to infer that he was discharged in retaliation for whistleblowing.**

Kasprzyk next asserts that Scoular violated Kansas law by terminating him because he expressed concerns about workplace safety. Doc. 37 at 12. Kansas generally follows the employment-at-will doctrine, which allows employers "to terminate employees for good cause, for no cause, or even the wrong cause." *Goodman v. Wesley Med. Ctr., L.L.C.*, 276 Kan. 586, 589 (2003). But employees may bring retaliatory discharge claims under the whistleblower exception to the at-will doctrine. *Id.* This common-law tort is a "limited exception to the at-will employment doctrine *when it is necessary to protect a strongly held state public policy from being undermined*." *Platt v. Kan. State Univ.*, 305 Kan. 122, 133 (2016) (quoting *Campbell v. Husky Hogs, L.L.C.*, 292 Kan. 225, 229 (2011)). This includes "reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare." *Palmer v. Brown*, 242 Kan. 893, 900 (1988).

A burden-shifting analysis is applied to whistleblowing discharge claims. The employee must first show that (1) "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law

pertaining to public health, safety, and the general welfare;" (2) "the employer had knowledge of the employee's reporting of such violation" prior to the discharge; and (3) "the employee was discharged in retaliation for making the report." *Goodman*, 276 Kan. at 589–90 (quoting *Palmer*, 242 Kan. at 900).

"In addition, the employee must prove that any whistleblowing was done in good faith based on a concern regarding the wrongful activity reported rather than for a corrupt motive like malice, spite, jealousy, or personal gain." *Id.* at 590. If the employee meets his or her burden, the employer must produce evidence that the employee was terminated for a legitimate, nondiscriminatory reason. *Id.* The burden then shifts back to the employee to produce evidence that the employer's motives were pretextual. *Id.*

Here, the Live Oak facility was facing an issue with dust and the feed bins at the Lake City facility "seemingly" needed replacement or repair. Doc. 39 at ¶¶ 37–38. Kasprzyk raised concerns about safety with members of Scoular management and discussed the dust issue at Live Oak with Nylund and another HR representative. *Id.* at ¶¶ 46–47. But, Kasprzyk cannot identify a particular law that Scoular was violating because of the conditions at the Florida facilities. *Id.* at ¶ 52.

Although Kasprzyk argues that a reasonably prudent person would agree that the Live Oak and Lake City facilities "had multiple issues" and "safety concerns of a serious nature," including "significant dust, degraded bins, as well as broken parts and/or materials necessary to the manufacturing process," he does not explain how these issues violated rules, regulations, or laws pertaining to public health, safety, or the general welfare. Instead, Kasprzyk argues only that his

supervision was aware of his concerns regarding "the state of the facilities" and "their need for repair."[5]

This is insufficient under Kansas law. *See Conge v. City of Olathe*, 64 Kan. App. 2d 383, 399–400 (2024) (concluding that where the plaintiff "fail[ed] to assert that either the [employer] or its employees violated any law, rule, or regulation relating to public health or safety," the plaintiff's assertion of whistleblowing was "'so vague, non-specific, and implausible' that it fail[ed]s to create a genuine issue of material fact in support of a prima facie case for retaliatory discharge"). Courts in this District have repeatedly held that plaintiffs must "clearly allege a violation of specific and definite rules, regulations, or laws beyond a mere feeling of wrongdoing." *McConnell v. IMA Fin. Grp., Inc.*, 2021 WL 877000, at *12 (D. Kan. Mar. 9, 2021) (quoting *Palmer v. Pentair*, 2019 WL 3239350, at *8 (D. Kan. July 18, 2019)); *see also Meier v. Shawnee Mission Med. Ctr., Inc.*, 2018 WL 6000549, at *3 (D. Kan. Nov. 15, 2018). Because Kasprzyk produces no evidence from which a reasonably prudent person could conclude Scoular or its employees were engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare, Kasprzyk's claim fails at the outset.

Kasprzyk's citation to *Flenker v. Wilamette Industries*, 266 Kan. 198 (1998), for the proposition that reporting unsafe workplace conditions to "the employer/OSHA" is protected conduct is also unavailing. The plaintiff in *Flenker* made an OSHA complaint one month before he was fired. *Flenker*, 266 Kan. at 199. Here, Kasprzyk raised concerns about dust issues and feed

[5] It is uncontroverted that the Live Oak and Lake City facilities had other safety issues, but Kasprzyk does not assert that he reported them. Doc. 46 at ¶¶ 15–16. These facts are therefore immaterial to his claim of retaliatory discharge. Likewise, Kasprzyk's failure to report his concerns to a government agency or through a Scoular hotline is immaterial because Kansas law only requires that the employee "seek[s] to stop unlawful conduct through the intervention of a higher authority, either inside or outside the company." *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 42 Kan. App. 2d 994, 1002 (2009).

bins "seemingly" in need of repair to Scoular management. Even if Kasprzyk had made a more specific complaint from which a reasonably prudent person could conclude that Scoular or its employees were violating the law, Kasprzyk has not presented evidence that he was terminated in retaliation for making a report.

Kasprzyk's only argument in support of his claim of retaliatory discharge is that he was terminated "shortly after voicing these concerns and requesting solutions to the issues." But this statement is not supported by a citation to the record and the only record evidence otherwise highlighted by the parties shows that Kasprzyk last communicated about the dust and feed bin issues in July 2023. Doc. 39 at ¶ 46. And Kasprzyk was terminated in July 2024. *Id.* at ¶ 73. This is not sufficient temporal proximity to establish causation and Kasprzyk has not produced any other evidence tying his discharge to his July 2023 complaints. *Stranghoner v. Gates Corp.*, 2019 WL 1557171, at *15 (D. Kan. Apr. 10, 2019). Because Kasprzyk presents no evidence from which a reasonable factfinder could infer that he was discharged in retaliation for raising concerns about dust issues and dilapidated feed bins at the Florida facilities—or that such a complaint rose to the level of whistleblowing—his retaliatory discharge claim fails.

**D. Because Kasprzyk did not meet all conditions precedent to receipt of the incentive bonus, his Kansas Wage Payment Act claim fails.**

Kasprzyk next asserts that Scoular's failure to pay his incentive bonus violated the Kansas Wage Payment Act ("KWPA"). The KWPA provides that when an employment relationship ends, "the employer shall pay the employee's earned wages not later than the next regular payday upon which he or she would have been paid if still employed." K.S.A. 44-315(a). But, "employers may require continued employment as a condition precedent to an employee's entitlement to various benefits." *Core Cashless, LLC v. Kansas Dep't of Lab.*, 2018 WL 3321173, at *10 (Kan. Ct. App. July 6, 2018). In determining whether a wage is earned, the Court must decide "whether the

documents drafted by the employer place a condition precedent on entitlement to the benefit or whether they attempt to impose a forfeiture." *Morton Bldgs., Inc. v. Dep't of Hum. Res.*, 10 Kan. App. 2d 197, 199 (1985).

Scoular argues that Kasprzyk's continued employment at Scoular was an unmet condition precedent to his entitlement to the bonus while Kasprzyk asserts that the continued employment requirement operated as a forfeiture of earned wages. Under Kansas law, "a condition precedent is something that it is agreed must happen or be performed before a right can accrue to enforce the main contract." *Weinzirl v. Wells Grp., Inc.*, 234 Kan. 1016, 1020 (1984). Here, it is undisputed that Scoular's offer letter to Kasprzyk stated that receipt of the bonus was contingent upon Kasprzyk's continued employment through the expected payout date of the bonus, and it is undisputed that Kasprzyk was no longer employed on the payout date. The Kansas Court of Appeals and this Court have both determined in similar cases that continued employment is a valid condition precedent to entitlement to a profit-sharing benefit or bonus. *Higgins v. REV Grp., Inc.*, 2021 WL 1339079, at *4 (D. Kan. Apr. 9, 2021), *aff'd*, 2021 WL 5895122 (10th Cir. Dec. 14, 2021); *Wesch v. Eldorado Nat'l, Inc.*, 2001 WL 37132511, at *1 (Kan. Ct. App. Oct. 26, 2001); *Morton Bldgs.*, 10 Kan. App. 2d at 202. Because Kasprzyk's offer letter expressly conditioned the incentive bonus on his continued employment through the payout date and because Kasprzyk was no longer employed by Scoular at that time, Kasprzyk's KWPA claim fails.

Although Kasprzyk cites *Kephart v. Data Systems International, Inc.*, 243 F. Supp. 2d 1205 (D. Kan. 2003) for the proposition that his bonus was earned on the date the fiscal year ended, the triable issue in *Kephart* was whether an employer implemented a forfeiture of an earned wage when it moved a bonus payment date by two weeks without notice to its employees. Here, the record shows that Kasprzyk's bonus was expressly "conditioned upon [his] continued employment

through the incentive payout date (typically August following fiscal year end)" and that Kasprzyk's employment was terminated on July 10, 2024. Because Kasprzyk presents no evidence that Scoular moved the goalposts, *Kephart* is distinguishable from the facts here.

### E. Because Kasprzyk has not shown that Scoular promised to pay the incentive bonus even if Kasprzyk was no longer employed by Scoular at the time of the bonus payout, his promissory estoppel claim fails.

Finally, Kasprzyk asserts that Scoular should be required to pay him the incentive bonus under the doctrine of promissory estoppel. "[P]romissory estoppel is 'an equitable doctrine designed to promote some measure of basic fairness when one party makes a representation or promise in a manner reasonably inducing another party to undertake some obligation or to incur some detriment as a result.'" *Peters v. Deseret Cattle Feeders, LLC*, 309 Kan. 462, 474 (2019) (quoting *Bouton v. Byers*, 50 Kan. App. 2d 34, 41 (2014), *rev. denied* 2015 Kan. LEXIS 148 (Kan. Feb. 19, 2015)). Promissory estoppel is "applicable when: (1) a promisor reasonably expects a promisee to act in reliance on a promise; (2) the promisee, in turn, reasonably so acts; and (3) a court's refusal to enforce the promise would countenance a substantial injustice." *Bouton*, 50 Kan. App. 2d at 41.

But, as addressed above, Scoular's offer letter to Kasprzyk stated that receipt of the bonus was contingent upon Kasprzyk's continued employment through the expected payout date of the bonus. And Kasprzyk was no longer employed on the bonus payout date. Kasprzyk has not produced any evidence that Scoular promised that it would not enforce the continued employment requirement. Kasprzyk has therefore failed to create a triable issue of fact as to his promissory estoppel claim and the Court grants summary judgment in Scoular's favor.

## IV. CONCLUSION

As explained herein, summary judgment in Scoular's favor is appropriate as to all claims raised in the Pretrial Order.

THE COURT THEREFORE ORDERS that Scoular's Motion for Summary Judgment (Doc. 38) is GRANTED.

This case is closed.

IT IS SO ORDERED.

Dated: August 11, 2026

s/ Jeffrey M. Kuhlman
JEFFREY M. KUHLMAN
UNITED STATES DISTRICT JUDGE